UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**19 CV 5711**

SOLOMON KROW
_____
Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been assigned)

-against-

PineBridge Investments Holdings US LLC, Ronan McGuinness
_____

Do you want a jury trial?
☐ Yes   ☐ No

Write the full name of each defendant. The names listed above must be identical to those contained in Section I.

## EMPLOYMENT DISCRIMINATION COMPLAINT

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 3/24/17

## I. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

SOLOMON          KROW
**First Name**    **Middle Initial**    **Last Name**

75 MAIN ST., #203
**Street Address**

WOODBRIDGE    NJ    07095
**County, City**    **State**    **Zip Code**

732 529 6802    SKROW118@GMAIL.COM
**Telephone Number**    **Email Address (if available)**

### B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1: PINEBRIDGE INVESTMENTS HOLDINGS US LLC
**Name**

399 PARK AVE. #4FL
**Address where defendant may be served**

NEW YORK    NEW YORK    10022
**County, City**    **State**    **Zip Code**

Defendant 2: RONAN Mc GUINNESS
**Name**

399 PARK AVE, #4FL
**Address where defendant may be served**

NY    NY    10022
**County, City**    **State**    **Zip Code**

Page 2

Defendant 3:

_____
Name

_____
Address where defendant may be served

_____
County, City          State          Zip Code

## II. PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

PINEBRIDGE  INVESTMENT HOLDINGS US LLC
_____
Name

399 PARK AVE, # 4FL
_____
Address

NY                    NY
_____
County, City          State          Zip Code

## III. CAUSE OF ACTION

### A. Federal Claims

This employment discrimination lawsuit is brought under (check only the options below that apply in your case):

☐ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, religion, sex, or national origin

The defendant discriminated against me because of my (check only those that apply and explain):

☐ race: _____

☐ color: _____

☐ religion: _____

☐ sex: _____

☐ national origin: _____

Page 3

☐ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

My race is: ~~AFRICAN AMERICAN~~

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: 1969

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: ~~BLIND~~

☒ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: BLIND

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

## B. Other Claims

In addition to my federal claims listed above, I assert claims under:

☒ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☒ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

## IV. STATEMENT OF CLAIM

### A. Adverse Employment Action

The defendant or defendants in this case took the following adverse employment actions against me (check only those that apply):

- ☐ did not hire me
- ☑ terminated my employment
- ☐ did not promote me
- ☑ did not accommodate my disability
- ☐ provided me with terms and conditions of employment different from those of similar employees
- ☑ retaliated against me
- ☐ harassed me or created a hostile work environment
- ☐ other (specify): _____

### B. Facts

State here the facts that support your claim. Attach additional pages if needed. You should explain what actions defendants took (or failed to take) *because of* your protected characteristic, such as your race, disability, age, or religion. Include times and locations, if possible. State whether defendants are continuing to commit these acts against you.

See attached

As additional support for your claim, you may attach any charge of discrimination that you filed with the U.S. Equal Employment Opportunity Commission, the New York State Division of Human Rights, the New York City Commission on Human Rights, or any other government agency.

## V. ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☑ Yes (Please attach a copy of the charge to this complaint.)

When did you file your charge?  NEW YORK

☐ No

Have you received a Notice of Right to Sue from the EEOC?

☑ Yes (Please attach a copy of the Notice of Right to Sue.)

What is the date on the Notice?  3/25/19   X

When did you receive the Notice?  approximately 4/2/19

☐ No

## VI. RELIEF

The relief I want the court to order is (check only those that apply):

☐ direct the defendant to hire me

☐ direct the defendant to re-employ me

☐ direct the defendant to promote me

☐ direct the defendant to reasonably accommodate my religion

☐ direct the defendant to reasonably accommodate my disability

☑ direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

Compensatory damages in the form backpay, bonus, benefits, emotional distress and any other appropriate relief.

Page 6

## VII. PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated: 6/19/2019

Plaintiff's Signature: [signature]

First Name: SOLOMON
Middle Initial: K
Last Name: KROW

Street Address: 75 MAIN ST, #203

County, City: WOODBRIDGE
State: NJ
Zip Code: 07095

Telephone Number: 732-829-6802

Email Address: SKROW118@GMAIL.COM

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes   ☐ No

> If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.



United States District Court
Southern District of New York

# Pro Se (Nonprisoner) Consent to Receive Documents Electronically

Parties who are not represented by an attorney and are not currently incarcerated may choose to receive documents in their cases electronically (by e-mail) instead of by regular mail. Receiving documents by regular mail is still an option, but if you would rather receive them only electronically, you must do the following:

1. Sign up for a PACER login and password by contacting PACER[1] at www.pacer.uscourts.gov or 1-800-676-6856;

2. Complete and sign this form.

If you consent to receive documents electronically, you will receive a Notice of Electronic Filing by e-mail each time a document is filed in your case. After receiving the notice, you are permitted one "free look" at the document by clicking on the hyperlinked document number in the e-mail.[2] Once you click the hyperlink and access the document, you may not be able to access the document for free again. After 15 days, the hyperlink will no longer provide free access. Any time that the hyperlink is accessed after the first "free look" or the 15 days, you will be asked for a PACER login and may be charged to view the document. For this reason, *you should print or save the document during the "free look" to avoid future charges.*

## IMPORTANT NOTICE

Under Rule 5 of the Federal Rules of Civil Procedure, Local Civil Rule 5.2, and the Court's Electronic Case Filing Rules & Instructions, documents may be served by electronic means. If you register for electronic service:

1. You will no longer receive documents in the mail;

2. If you do not view and download your documents during your "free look" and within 15 days of when the court sends the e-mail notice, you will be charged for looking at the documents;

3. This service does *not* allow you to electronically file your documents;

4. It will be your duty to regularly review the docket sheet of the case.[3]

---

[1] Public Access to Court Electronic Records (PACER) (www.pacer.uscourts.gov) is an electronic public access service that allows users to obtain case and docket information from federal appellate, district, and bankruptcy courts, and the PACER Case Locator over the internet.

[2] You must review the Court's actual order, decree, or judgment and not rely on the description in the email notice alone. *See* ECF Rule 4.3

[3] The docket sheet is the official record of all filings in a case. You can view the docket sheet, including images of electronically filed documents, using PACER or you can use one of the public access computers available in the Clerk's Office at the Court.

500 PEARL STREET | NEW YORK, NY 10007
300 QUARROPAS STREET | WHITE PLAINS, NY 10601

PRO SE INTAKE UNIT: 212-805-0175

rev. 2/9/15

## CONSENT TO ELECTRONIC SERVICE

I hereby consent to receive electronic service of notices and documents in my case(s) listed below. I affirm that:

1. I have regular access to my e-mail account and to the internet and will check regularly for Notices of Electronic Filing;

2. I have established a PACER account;

3. I understand that electronic service is service under Rule 5 of the Federal Rules of Civil Procedure and Rule 5.2 of the Local Civil Rules, and that I will no longer receive paper copies of case filings, including motions, decisions, orders, and other documents;

4. I will promptly notify the Court if there is any change in my personal data, such as name, address, or e-mail address, or if I wish to cancel this consent to electronic service;

5. I understand that I must regularly review the docket sheet of my case so that I do not miss a filing; and

6. I understand that this consent applies only to the cases listed below and that if I file additional cases in which I would like to receive electronic service of notices of documents, I must file consent forms for those cases.

**Civil case(s) filed in the Southern District of New York:**

**Note:** This consent will apply to all cases that you have filed in this court, so please list all of your pending and terminated cases. For each case, include the case name and docket number (for example, John Doe v. New City, 10-CV-01234).

Name (Last, First, MI): KROW SOLOMON

Address / City / State / Zip Code: 75 MAIN ST, #203, WOODBRIDGE, NJ 07095

Telephone Number: 732-829-6802

E-mail Address: SKROW118@GMAIL.COM

Date: 6/19/19

Signature: [signed]

**Return completed form to:**

Pro Se Intake Unit (Room 200)
500 Pearl Street
New York, NY 10007

STATEMENT OF FACTS

1. I am the pro se plaintiff in this matter.

2. I am a 50-year-old male who is disabled in that I am significantly visually impaired, which limits my ability to perform certain daily life activities, including reading, writing and typing. I am considered legally blind by the United States Social Security Administration and the New Jersey Commission of the Blind. I was deemed eligible for disability benefits under social security because of my disability effective January 18, 2018 and began receiving benefits in July 2018.

3. I have worn glasses for most of my life, but my poor eyesight deteriorated significantly after I had a stroke on June 7, 2015. After the stroke, my eyesight got progressively worse.

4. In June 2017, I was formally diagnosed as being legally blind as referenced specifically below. As a result of my impaired eyesight, I am unable to read, write or type without the assistance of special equipment.

5. From February 2, 2011 through January 2014, I was employed as a Senior Systems Engineer in the Infrastructure Technology team at PineBridge Investments ("PineBridge"), working as an IT Consultant through an outside consulting firm, the Judge Group. In January 2014, PineBridge, pleased with my work, hired me directly as a full-time employee in the Senior System Engineer position.

6. As a Senior System Engineer, my responsibilities included building out infrastructure, maintaining infrastructure security, trouble-shooting software issues and resolving software issues related to various operating facilities.

7. I received very positive annual performance reviews in 2014 and 2015. I received performance-related bonuses in each of the years 2014, 2015 and 2016.

8. After my stroke on June 7, 2015, I missed approximately 3 weeks before returning full-time to my job at PineBridge. Immediately after the stroke, my eyesight was blurry and unfocused. I also suffered partial paralysis on my left side. These conditions persisted after the stroke and I received ongoing therapy for both medical issues.

9. I returned to work full-time in July 2015, but my eyesight was significantly impaired and I had impaired functionality on my left side. I attempted to resume most of my former responsibilities, but because of my disability, I was frustrated with a reduced capacity for performing the functions of my job.

10. Shortly thereafter, I began eye-sight therapy to help me cope with my disability and to allow me to continue my work responsibilities.

11. I was very anxious about my job, but determined to return to perform at full capacity.

12. Over the course of the next year, PineBridge added new responsibilities to my workload, including desktop support. I made every effort to keep up with my workload, but as my eyesight disability made completing my tasks efficiently increasingly more difficult, I knew I would need sight-enhancing equipment to perform my responsibilities at a higher level.

1

13. While I was not fully aware of my rights to reasonable accommodation, I repeatedly and with increasing urgency verbally advised my supervisor, Yousef Hamade, that I needed vision enhancement equipment to perform my responsibilities satisfactorily.

14. I assumed that Mr. Hamade discussed these requests with his direct supervisor, Mr. Ronan McGuinness, PineBridge's Chief Technology Officer.

15. PineBridge took no action during 2016 in response to my requests for accommodation and I was so nervous about losing my job, I did not press the issue with anyone else at PineBridge.

16. During this period, I also requested permission to work remotely at home a couple of days a week because working from home would give me more time to complete my responsibilities.

17. These requests were repeatedly denied as being against PineBridge policy, notwithstanding that other employees were regularly permitted to work from home for various personal reasons.

18. On or around January 5, 2017, I received an annual performance review for 2016 from Mr. Hamade that included criticisms regarding my performance without attribution to my disability.

19. I requested clarification around this warning and PineBridge's expectations given my disability. I once again verbally noted my need for assistance and flexibility to accommodate my disability.

20. In February 2017, I was awarded a performance bonus of $16,500.

21. Having failed to get reasonable accommodations pursuant to my verbal requests, and having been blindsided by the negative evaluation, in January 2017, I formally informed PineBridge, in an e-mail to the Human Resources Department that I was significantly visually impaired and requested reasonable accommodations for my disability in the form of special sight-enhancing equipment.

22. On January 10, 2017, I sent a letter dated January 6, 2017, from the NJ Commission for the Blind to Mr. McGuinness and Ms. Heather Buxton, head of HR for PineBridge, formally informing them of the Commission's "certification that Mr. Solomon Krow is an individual with the significant loss of vision . . . and has been declared eligible tor vocational rehabilitation services." The letter noted that I would need "devices/equipment necessary to maintain current employment."

23. On January 12, 2017, Ms. Buxton sent me an e-mail in which she acknowledged receiving my letter from the Commission for the Blind and inaccurately claimed that this was the first time that PineBridge was made aware of my need for reasonable accommodation.

24. What followed over the ensuing year was a series of actions by PineBridge that paid lip service to my right and need for a reasonable accommodation while never actually providing the reasonable accommodation.

25. PineBridge built an unfair case of underperformance against me rather than providing me with the equipment I needed to perform the functions of my position.

26. An organization with the resources of PineBridge could have supplied me with a reasonable accommodation at some point before they terminated me but the company failed to do so.

27. On January 17, 2017, Ms. Buxton's subordinate in HR, Irene Arapos, sent me an e-mail stating the following: "[W]e are temporarily taking away certain responsibilities to help you focus on improving your performance as a Senior Systems Engineer in the Infrastructure Technology team at PineBridge." The letter falsely claimed that I had a "clear understanding" of the determinations that PineBridge had made in in its January 5 performance warning, suggesting that I had agreed with its conclusions, when in fact I had disagreed with the criticisms as being unfair in light of my disability .

28. Significantly, the message from Ms. Arapos did not mention a response to my requests for reasonable accommodation in the form of sight-enhancing equipment.

29. After the January 2017 performance review, I had weekly meetings with Mr. Hamade and someone from HR in which Mr. Hamade would raise performance issues and discuss the re-assignment of some responsibilities. I would respond by explaining how my disability affected my performance, acknowledging the challenges, and asking for help by providing reasonable accommodation for my disability.

30. Over the subsequent months, PineBridge reassigned many of my responsibilities rather than providing the reasonable accommodation that I needed to perform those responsibilities. The duties reassigned included responsibilities relating to infrastructure, server patching, SCCM administration, Symantec infrastructure administration and desk top support. There was a clear pattern of decisions by PineBridge that reallocated work away from me and frustrated my request for a reasonable accommodation.

31. Even as the company reassigned my responsibilities for backing up the network, building out the network and dealing with security threats, PineBridge employees continued to come to me for help with these issues because of my expertise in these areas.

32. During 2017, Mr. Hamade began setting unattainable performance goals for me, including migrating over one hundred employees from Blackberry to I-Phones on a timetable that was impossible even for someone with perfect eyesight. At the same time, the company made no reasonable accommodations for my legal blindness.

3

33. I was very reluctant to strongly object or report the lack of reasonable accommodations as I was still extremely concerned about the security of my job.

34. On June 1, 2017, Mr. Hamade met with me to discuss what he alleged were deficiencies in my performance, including prioritizing workload, attention to detail and time-management.

35. I told Mr. Hamade that I felt his criticisms were largely unfair given that I was being asked to handle a very heavy workload without the benefit of appropriate accommodations for my disability.

36. Convinced that PineBridge was ignoring my need for reasonable accommodation by design, on June 2, 2017, at my request, the New Jersey Commission for the Blind provided PineBridge with a detailed list of the equipment recommended after a low vision exam to improve my work efficiency. The total cost for the five items on the list was $1,303.

37. Over the ensuing months, PineBridge made it clear that they were looking to the New Jersey Commission for the Blind to acquire and pay for the equipment rather than simply purchasing it themselves.

38. In June 2017, after five months of PineBridge representing that it was considering my request for reasonable accommodation but clearly dragging its feet on fulfilling its responsibility, I delivered to Ms. Buxton and Mr. McGuinness a copy of a letter dated June 20, 2017 from Janet Rucker, MD, Division Director, Neuropthamology, at NYU-Langone Medical Center, stating her conclusion that I was legally blind and would need special accommodation for my disability.

39. On or around August 8, 2017, while PineBridge continued to delay and equivocate by directing me to work with the New Jersey Commission for the Blind to obtain the required equipment , I delivered to Ms. Buxton and Mr. McGuinness a letter from William O'Connor, M.D., a low-vision specialist at The SUNY College of Optometry, once again confirming that I was legally blind, advising of the need for a reasonable accommodation at work and again recommending specific enhancement equipment.

40. This was essentially the same equipment that had been recommended by The New Jersey Commission for the Blind earlier. The only additional item on the list was a touch screen. To my frustration, PineBridge used this slight variation in the equipment recommendations to further delay fulfilling its obligation to make a reasonable accommodation.

41. On or around August 9, 2017, after months with no discernible progress, PineBridge's HR department assigned fault for the delay in purchasing the equipment to me and to the N.J. Commission for the Blind, despite the fact that they knew or should have known that, as my employer, they were required to provide the equipment as a reasonable accommodation pursuant to federal and state law.

42. PineBridge stated that, if necessary, I would have to take unpaid leave to secure certain expense information relating to the equipment.

4

43. On August 10, 2017, I replied with an email to Ms. Buxton stating that I believed the cost was the company's responsibility under the ADA and asking the company to flesh out PineBridge's reasons failing to provide me with the needed equipment. I wrote, "Please advise me if the cost [for the accommodations] is prohibitive."

44. I was trying to get PineBridge to acknowledge that the cost of the equipment was not prohibitive and therefore that the accommodation was reasonable.

45. In fact, the cost of the equipment was nominal for a successful organization such as PineBridge.

46. On information and belief, PineBridge spent far more on special ergonomic chairs and desks to accommodate other employees.

47. In pressing for the company to provide me with a reasonable accommodation so that I could perform the essential functions of my job, I was engaging in protected activity.

48. The next day, on August 11, 2017, PineBridge sent me a detailed performance warning letter from my manager, Mr. Hamade. The close temporal proximity between my protected activity on August 10 and the receipt of the August 11, 2017 letter demonstrates that the letter was sent in retaliation for engaging in protected activity by pressing for the company to provide me with the needed equipment.

49. On August 11, 2017, Ms. Buxton sent me a disingenuous email in which she said, "Apologies for any confusion – we had understood that it [the equipment] was being paid for by you or the Commission. But either way, we would like to begin implementation of the recommendation as soon as possible. If the Commission does not approve your application or otherwise refuses to cover the costs of the equipment and software, then PineBridge will pay those reasonable costs. I will call you on Monday to follow up."

50. Ms. Buxton never called me that Monday, nor did she or anyone else at PineBridge follow up on her promise to acquire the equipment.

51. PineBridge's earlier position that they expected either me or the N.J. Commission for the Blind to pay for all or a portion of the equipment was asserted in bad faith. The company knew or reasonably should have known that it was the company's responsibility to provide the reasonable accommodation. .

52. My supervisor, Mr. Hamade left the company in July 2017. I continued to meet weekly with HR, and Mr. McGuinness often participated virtually. The discussions focused on how things were going with the changes in my responsibilities, but PinBridge never purchased the recommended equipment. I noted that some of the new responsibilities were even more challenging, given my disability, than some of my former responsibilities.

5

53. We continued to discuss accommodations for my disability. The main purpose of these meetings was to build a record of warnings to justify terminating me. These meetings did nothing to solve my need for a reasonable accommodation.

54. In August of 2017, at one of the weekly meetings, David Wang (Network Engineer) brought up the fact that he spent several hours assisting me with a used large monitor and that "these monitors were the worst model bought . . . ." Mr. McGuinness responded: "do not bother with Solomon's monitor because I am making other arrangements...."

55. In hindsight, I realize that the "other arrangements" he referenced were his plans to find a way to terminate me in the near future.

56. I was appreciative when PineBridge appeared to be willing to provide the necessary equipment, but the reality was that they never too the simple step of purchasing the recommended equipment. On the contrary, they continued to take steps to absolve themselves of responsibility by building a contrived case for eliminating my position.

57. On November 9, 2017, at her request, I again sent an email to Ms. Buxton with a specific list of the sight-enhancing equipment that PineBridge should acquire for my use <u>exclusively</u> at the office.

58. In November 2017, frustrated with PineBridge's failure to supply me with the equipment I needed as a reasonable accommodation at work, with financial assistance from the N.J. Commission for the Blind, I purchased some of the needed sight-enhancing equipment for use at home.

59. The items I purchased included:

    a. iZoom software

    b. SmarLux Digital Portable Video Magnifier

    c. Near Vision glasses

    d. Magno Monucular Telescope KS-T616

    e. Mobilux LED Illuminated hand-held Magifier

60. When PineBridge discovered that I had purchased the equipment, they directed me to bring in my personal sight-enhancement equipment for use at the office.

61. I asked PineBridge to separately purchase some of these devices so that I would not have to transport them between home and the office.

62. By late November, I reluctantly began to bring the above-described equipment with me to the office.. This was a burden as I had to drag the heavy equipment back and forth between my home and office.

6

63. In subsequent weekly meetings with HR and Mr. McGuinness, the discussion focused on whether the equipment was helping with my work.

64. I responded that I had been able to accomplish my work more efficiently with the equipment and that I expected things to continue to improve as I got accustomed to using the new equipment.

65. There was no new feedback on my performance through the date I was terminated.

66. In December 2018, PineBridge hired a new IT manager to replace Mr. Hamade.

67. I was notified of my termination on January 19, 2018, based <u>not</u> on criticisms of my performance, but allegedly because my position was being eliminated due to restructuring. After failing to provide the reasonable accommodation that would have allowed me to manage my responsibilities, PineBridge tried to cover its dereliction by fabricating a non-existent organization restructuring.

68. Upon information and belief, my job duties were assigned to several different people, 2 of whom were new hires, refuting PineBridge's assertion that it had eliminated my position.

69. The reference to a restructuring was a clear pretext for dismissing me. On information and belief, only one other employee was severed at the same time as me, and that employee retired at age 68.

70. Any re-assignment of my responsibilities was motivated by PineBridge's refusal to accommodate my disability and not because of any overall reorganization of the firm's IT operation.

71. As set forth above, PineBridge terminated me in violation of the ADA, New York State Human Rights Law and New York City Human Rights Law after it failed to make reasonable accommodations that would have allowed me to perform my essential job functions, and in retaliation for my requests for reasonable accommodations.

_[signature]_
Solomon Krow

---

[1] This document was prepared with assistance from the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants in the Southern District of New York.