UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOLOMON KROW,

                  Plaintiff,

       – against –

PINEBRIDGE INVESTMENTS
HOLDINGS U.S. LLC and RONAN
MCGUINNESS,

                  Defendants.

**<u>OPINION & ORDER</u>**

19 Civ. 5711 (ER)

<u>Ramos, D.J.</u>:

       Solomon Krow brings this action *pro se* against his former employer, PineBridge Investments Holdings U.S. LLC ("PineBridge"), and his former supervisor Ronan McGuinness, alleging failure to accommodate, discrimination, and retaliation in violation of the Americans with Disabilities Act ("ADA"), New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL").[1]  Doc. 2.  Krow is legally blind and previously worked as a senior systems engineer at PineBridge. PineBridge now moves for summary judgment pursuant to Fed. R. Civ. P. 56.  Doc. 33. For the reasons set forth below, PineBridge's motion for summary judgment is GRANTED as to all of Krow's federal claims and as to his discrimination and retaliation claims arising from his termination.  The Court declines to exercise supplemental jurisdiction over his surviving state and city claims.

---

[1] *See* 42 U.S.C. 2 U.S.C. § 1210 *et seq.*, N.Y. Exec. Law § 296, *et seq.*, N.Y.C. Admin. Code § 8–107, *et seq.*, respectively.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Krow's Employment with PineBridge Before 2017

PineBridge is a global asset manager with offices and staff in the United States, Europe, Africa, Asia, and the Middle East.  Doc. 38 (Def.'s 56.1) ¶ 1.  From approximately February 2011 through January 2014, Krow worked for PineBridge as an information technology ("IT") consultant.  Doc. 2 at 10 ¶ 5; Doc. 38 ¶ 6; Doc. 37-1 (Krow Dep. Tr.) at 11–12.  In approximately November 2013, PineBridge offered him a position as a senior systems engineer, and Krow began his employment with the company in January 2014.  Doc. 38 ¶ 6; Doc. 37-1 at 11; Doc. 37-2 at 3–4.  Krow's responsibilities included IT infrastructure projects and support, audit controls, business contingency planning and disaster recovery, cyber security, and IT training.  Doc. 38 ¶ 4; Doc. 51 (Krow Decl.) ¶ 4; Doc. 37-1 at 13–14, 17–18.  As a senior systems engineer, Krow reported to Senior Vice President and Head of IT Infrastructure Systems for the Americas Yousef Hamade, who in turn reported to Managing Director and Global Chief Information Officer Ronan McGuinness.  Doc. 38 ¶ 3.

Krow alleges that he received positive annual performance reviews and performance bonuses for the 2014 and 2015 years.  Doc. 2 at 10 ¶ 7; Doc. 51 ¶ 5.  On both his 2014 and 2015 annual performance reviews, Krow received overall ratings of "meets expectations."  Doc. 51 at 15–39; Doc. 55-3.[3]  However, the 2015 annual performance review rated him as "needs improvement" in certain categories and indicated that he needed to improve his time management and balancing of daily tasks with longer term projects.  *See* Doc. 55-3 at 5, 7.

---

[2] These facts are undisputed unless otherwise noted.

[3] Krow's 2015 annual performance review was submitted by Krow as Doc. 51 at 31–39 and by PineBridge as Doc. 55-3.  Certain exhibits, including some of Krow's emails with PineBridge management and his performance reviews, have been submitted by both parties.  Where both parties have submitted the same documents, the Court will refer to the PineBridge exhibits.

In his complaint, Krow alleges that he suffered a stroke in June 2015 and had to take approximately three weeks off work.  Doc. 2 at 10 ¶ 8.  As a result of the stroke, Krow suffered partial paralysis on his left side:  he required therapy and had "impaired functionality" on his left side for some time after.  *Id.* ¶¶ 8–10.  Furthermore, although Krow had required glasses for most of his life, after the stroke he became legally blind.  *Id.* ¶¶ 3–4, 8–9.  He required eyesight therapy and special equipment to read, write, and type.  *Id.* ¶¶ 4, 10.  Krow's complaint alleges that his poor vision made it difficult for him to do his work, and that he repeatedly told Hamade that he needed vision enhancement equipment.[4]  *Id.* ¶¶ 12–13.

By 2016, Krow's performance reviews had declined.  Krow's 2016 mid-year review, dated July 15, 2016, included comments that he "need[ed] to ensure timely updates" to management and needed to improve his time management "balancing the competing priorities and timelines between projects and support."  Doc. 55-4 at 4.  On August 11, 2016, Hamade issued Krow a formal written warning stating that "[f]ailure to demonstrate immediate and sustained improvement will result in further disciplinary action up to and including the termination of your employment."  Doc. 38 ¶ 7; Doc. 37-2 at 25–26.  On August 15, 2016, Krow emailed a three-page letter in response to Hamade's warning, copying Hamade's supervisor McGuinness and Irene Arapos in the Human Resources ("HR") department.  Doc. 38 ¶ 8; Doc. 55-1; Doc. 37-1 at 24–25, 57–58.  Krow's response defended his work product, explained that he was "overloaded" with work, and stated that he had been hospitalized twice in 2015, once for a heart condition and once for a "mild stroke."[5]  Doc. 37-2 at 28–30.  Krow's response did not mention

---

[4] Krow has not adduced evidence beyond his declaration that he told Hamade about his need for such equipment.  PineBridge maintains that he first informed the company that he was legally blind and in need of vision enhancement equipment in January 2017.  *See* Doc. 34 at 4–6.

[5] Krow's August 15, 2016 response to the company references a heart condition in addition to the stroke.  *See* Doc. 37-2 at 29 ("To reiterate, Mr. Yousef Hamade, you were quite aware that I was hospitalized back in January 2015 for Heart Failure and in June 2015 for a mild stroke.").  However, Krow's complaint does

that he was legally blind, or indeed that he had any problems with his vision.  On August 23, 2016, Arapos responded to Krow's message, copying Heather Buxton, the head of HR Department for the Americas, "I noticed that you mentioned your health issues in your response and wanted to check in with you to see if you required any further accommodations to perform your job.  If so, please let me know as soon as possible so we may evaluate."[6]  Doc. 38 ¶ 9; Doc. 37-2 at 62.  Krow did not respond to Arapos' email.[7]  Doc. 38 ¶ 10; Doc. 37-1 at 60.

On his 2016 annual performance review, Krow received an overall rating of "unacceptable," the lowest possible rating.  Doc. 38 ¶ 11.  With respect to three different categories of the evaluation, Krow's manager commented, "Performance has not met expectations[;] improvement required or separation from the company may occur."  *Id.*; Doc. 37-1 at 39; Doc. 37-2 at 32–40.  The evaluation further stated that Krow had been placed on a performance plan requiring him to demonstrate "immediate and sustained improvement."  Doc. 37-2 at 40.  The evaluation included space for employee comments, and Krow commented that he had faced health challenges, including his stroke and a knee injury, but that he was attending physical therapy and that his doctors expected him to make a full recovery.  Doc. 37-2 at 39.  Although Krow included information about his health challenges, nowhere in the evaluation did he state that he was legally blind or that he had any vision problems.

---

not allege any disability connected to his heart problems or any failure by PineBridge to accommodate the same.

[6] Krow does not dispute that Arapos sent the email or that she inquired about accommodations, but Krow writes in his response that, since Arapos did not inquire about his specific health issues, "it would be reasonable to assume she had spoken with Mr. Hamade and was fully informed regarding my vision and disability.  Otherwise, her failure to ask about the specific nature of my disability would have been a serious omission under the ADA and comparable statutes."  Doc. 50 (Pl.'s Res. 56.1) ¶ 9.

[7] Krow acknowledges that he did not reply, but he writes in response that he did not understand what Arapos meant by "accommodation," and that he was uninformed about his legal rights and his employer's obligations.  Doc. 50 ¶ 10.

On January 5, 2017, Hamade issued Krow a "Final Written Warning," copying Arapos, stating that Krow's employment would be terminated unless he showed "immediate and sustained improvement" in several areas.  Doc. 38 ¶ 12; Doc. 37-1 at 41; Doc. 37-2 at 42–43.

### B.  PineBridge and Krow's 2017 Efforts Towards a Reasonable Accommodation

On January 10, 2017, Krow emailed a letter from the New Jersey Commission for the Blind and Visually Impaired ("NJCB") to Hamade, McGuinness, Arapos, and Buxton. Doc. 38 ¶ 13; Doc. 37-1 at 61–62; Doc. 37-2 at 64–67.  The letter, dated January 6, 2017 and signed by vocational rehabilitation counselor Vladimir Kravtsov, stated as follows:

> This letter serves as a certification that Mr. Solomon Krow is an individual with the significant loss of vision identified by the NJ Commission for the Blind and Visually Impaired and has been declared eligible for vocation rehabilitative services.  These services will be aimed at assisting Mr. Krow with acquiring compensatory skills and devices/equipment necessary to maintain current employment.

Doc. 37-2 at 64.  The next day, Buxton wrote to acknowledge receipt of the letter, stating, "As this is the first time we have been made aware of your visual impairment, we would like to sit down and discuss with you what accommodation, if any, you are requesting at this time to perform your essential job functions.  [ . . . ]  We will address this issue expeditiously as it is of utmost importance."[8]  Doc. 37-2 at 65.  On January 12, Arapos and Buxton met with Krow to discuss possible accommodations, and Buxton sent a follow up email confirming her understanding that Krow was not requesting any accommodations from PineBridge at that time.[9]  Doc. 38 ¶¶ 15–16; Doc. 37-1 at 65–68; Doc. 37-2 at 69.

---

[8] Krow does not dispute that Buxton sent this email on January 11, 2017, but does dispute her statement that it was the first time HR was made aware of his vision disability or its impact on his work.  Doc. 50 ¶ 14.  Krow writes in his declaration that his August 2016 response to Hamade's written warning informed the company of his disability and the impact on his performance.  *Id.*; Doc. 51 ¶¶ 7, 10–12, 16.  However,

Throughout 2017, Krow met weekly with PineBridge management, including both his IT supervisors and HR staff, to discuss his progress.  Doc. 38 ¶ 17; Doc. 50 ¶ 17; Doc. 35 (Motz Decl.) ¶ 12; Doc. 37-1 at 51.  Jennifer Motz, PineBridge's Global Head of HR, participated in Krow's weekly performance meetings.  Doc. 35 ¶¶ 1, 12; Doc. 37-1 at 51. Krow claims that in some of those meetings he informed PineBridge that he was working with NJCB to obtain vision enhancement equipment.  Doc. 50 ¶ 17; Doc. 51 ¶ 25.  In approximately July 2017, Hamade left the company, and McGuinness became Krow's direct supervisor.  Doc. 37-1 at 19–20.

In early May, Krow asked PineBridge to help Kravtsov, his caseworker at NJCB, to purchase vision enhancement equipment as an accommodation for him.  Doc. 38 ¶ 23; Doc. 35 ¶ 16; Doc. 36 (Buxton Decl.) ¶ 6; Doc. 37-1 at 72–73.  At that point, Krow was waiting for an assessment by NJCB and did not know exactly what equipment he would need.  Doc. 38 ¶ 24; Doc. 37-1 at 69–70.  On May 16—twelve days after Krow had first told Motz that Kravtsov would contact her—Kravtsov sent Motz an introductory email with his contact information.  Doc. 38 ¶¶ 26–29; Doc. 37-2 at 72–74.  Motz responded within the hour and asked Kravtsov about next steps for evaluating Krow's worksite, stating, "We would like to help in any way possible."  Doc. 38 ¶ 29; Doc. 37-2 at 74.  On May 24, having received no response from Kravtsov, Motz sent a follow-up email, to which Kravtsov replied that he was "working on purchasing low vision aids" for Krow and that when he found out what kind of computer equipment or software would benefit Krow, he would ask to visit Krow's worksite with an assistive technology specialist. Doc. 38 ¶ 31; Doc. 37-2 at 74.  On June 2, Kravtsov emailed Motz a list of recommended vision enhancement equipment and informed her that Krow had asked NJCB to assist

---

nowhere in that response did Krow state that he is legally blind or that he has any kind of disability related to his vision.  *See* Doc. 37-2 at 28–30.

[9] Krow disagrees with Buxton's understanding of the meeting, as PineBridge knew that he was trying to determine what equipment and training might help him perform his job.  Doc. 50 ¶ 16.  However, Krow does not state in his opposition that he did ask PineBridge for an accommodation for his vision at that time.

him with purchasing the equipment, which process required Krow to submit information about his finances for approval to NJCB.  Doc. 38 ¶ 32; Doc. 37-2 at 77–79.

Over the next five months, PineBridge and Krow continued to seek the vision enhancement equipment through NJCB, as Krow had requested, in lieu of PineBridge purchasing it outright.  In the approximately five months between June and early November 2017, Motz and Buxton sent Kravtsov eleven emails asking him for updates about NJCB's review of Krow's finances and about the equipment he required.  Doc. 38 ¶¶ 33, 38, 40, 51, 54, 58–60, 74, 76, 78.  Kravtsov did not respond to six of those emails. Doc. 38 ¶¶ 34, 39, 41, 75, 77, 79.  Buxton and Motz also wrote frequently to Krow for information about his needs and for updates on the NJCB review of his finances and purchasing of equipment.  On approximately June 2, Motz asked Krow to provide a doctor's note documenting his disability and his needs.  Doc. 38 ¶ 33.  On June 20, Krow forwarded a letter from Dr. Janet Rucker at NYU Langone.  Doc. 38 ¶¶ 35–36; Doc. 37-1 at 83–84, 86–87.  The letter stated that Krow's vision had worsened after his stroke, and that he was "legally blind from his combination of ophthalmologic and neurologic conditions[.]"  Doc. 37-3 at 6.  The letter further stated that Dr. Rucker did not make recommendations for accommodations but rather would refer Krow to low vision services at the SUNY College of Optometry University Eye Center.  Doc. 38 ¶ 37; Doc. 37-3 at 6.

On July 25, not having received a response from Kravtsov about whether NJCB had approved Krow's application for financial assistance in purchasing vision enhancement equipment, Buxton wrote to Krow asking whether he had sent the required financial information to NJCB, adding, "your attention to this matter is of utmost importance."  Doc. 38 ¶ 42; Doc. 37-1 at 88–90; Doc. 37-3 at 13–14.  Krow replied on July 28, stating that he was still gathering doctor's receipts and expenses, that some of the documents requested were in storage, and that he would send the required information to NJCB by early the next week.  Doc. 38 ¶ 45; Doc. 37-3 at 13–14.  On August 3, Krow

sent Buxton and McGuinness a letter from Dr. William O'Connell of the SUNY Eye Center, which recommended certain vision enhancement equipment—some of which differed from NJCB's June 2 recommendations—and referred Krow to back to NJCB. Doc. 38 ¶ 49, 54–55; Doc. 37-3 at 16–18.

On August 9, Krow emailed Buxton, McGuinness, Arapos, and Kravtsov that he understood that it was PineBridge's obligation to make reasonable accommodations for him, and that, "[t]hrough no fault of yours, I have already been working for many years at PineBridge without any vision accommodations, but I now know that these recommendations by the disability experts for the visually impaired, shall facilitate and improve my work." Doc. 38 ¶ 50; Doc. 37-3 at 24. On August 10, Buxton asked Kravtsov for an update as to whether NJCB had approved Krow's request for financial assistance. Doc. 38 ¶ 51; Doc. 37-5. On August 11, Buxton responded to Krow's August 9 email directly, apologizing for confusion and stating that the company had understood that the equipment was "being paid for by you or the Commission." She further stated that PineBridge wanted to implement his accommodations as soon as possible and stated that if NJCB "does not approve your application or otherwise refuses to cover the costs of the equipment and software, then PineBridge will pay those reasonable costs." Doc. 38 ¶ 52; Doc. 37-1 at 98–100; Doc. 37-3 at 23–24. On August 14, Krow emailed McGuinness, Buxton, and Arapos, thanking them for their help with his vision accommodations and stating that he had forwarded his receipts and bank statements to Kravtsov. Doc. 38 ¶ 53; Doc. 37-3 at 44. On August 15, Kravtsov confirmed that he had received documentation of Krow's expenses and that NJCB would determine what percentage of the cost of the equipment they would cover. Kravtsov also stated that Dr. O'Connell was not a registered service provider in New Jersey, and that Krow had already seen another doctor based in New Jersey, Dr. Edward Maslansky. Doc. 37-3 at 27–30.

On August 22, Buxton emailed Krow for clarification about exactly what equipment he needed and where to purchase it.  Doc. 38 ¶¶ 55–57; Doc. 37-3 at 26–27; Doc. 37-1 at 104–06.  Krow thanked Buxton for her help with his accommodations and responded that he would need the tools listed in Kravtsov's August 15 email—near vision glasses, screen magnification software, a telescope, a portable video magnifier, and a hand-held magnifier—in addition to a touch screen monitor with Windows 10 recommended by Dr. O'Connell.  Doc. 38 ¶ 56; Doc. 37-3 at 26.  On August 24, August 31, and again on September 6, Buxton emailed Kravtsov and Krow asking for a preferred vendor to purchase the equipment.  Doc. 38 ¶¶ 59–60; Doc. 37-1 at 106–08; Doc. 37-3 at 46–47.  Buxton stated again that PineBridge wanted to put Krow's accommodations in places as soon as possible and would cover reasonable costs if NJCB did not approve his application.  Doc. 38 ¶¶ 59–60; Doc. 37-3 at 46–47.

On September 21 and again on September 22, Buxton emailed Krow asking for his doctor's information and for vendor information so that she could confirm the needed equipment and purchase it for him.  Doc. 38 ¶¶ 61–62; Doc. 37-1 at 110–11; Doc. 37-3 at 55.  Krow wrote her that the vendor was a company called Eschenbach; Buxton contacted them company only to learn that Eschenbach was a wholesaler that sold directly to doctors.  Doc. 38 ¶ 64; Doc. 36 ¶ 11.  Buxton then contacted Dr. Maslansky's office and learned that the doctor would order the equipment for Krow, but that he needed to re-evaluate Krow first.  Doc. 38 ¶¶ 68–70; Doc. 36 ¶¶ 11, 13.

On October 25, Krow finally had his re-evaluation appointment, and McGuinness approved the day as paid time off for him so that he could attend the appointment.  Doc. 38 ¶¶ 71–72; Doc. 37-1 at 118–19.  On November 9, Krow emailed Buxton and McGuinness to inform them that Dr. Maslansky had provided him with the equipment he needed, with the exception of reading glasses, which had been ordered for him.  Doc. 38 ¶ 80; Doc. 37-1 at 121–22; Doc. 37-3 at 75–76.  Buxton responded asking Krow to schedule a technology assessment with Kravtsov as soon as possible and stating that

PineBridge would provide him with paid time off to complete the assessment.  Doc. 38 ¶ 81; Doc. 37-3 at 74–75.  Krow replied, "Excellent – Thanks a million."  Doc. 38 ¶ 83; Doc. 37-3 at 75.  When asked at the conclusion of his deposition whether PineBridge had refused to provide him with what he asked for, Krow testified that they had not.  Doc. 38 ¶ 82; Doc. 37-1 at 123.

### C.  PineBridge Terminates Krow

Despite PineBridge and Krow's efforts, Krow's 2017 year-end performance review gave him an overall rating of "needs improvement," and indicated that he consistently missed deadlines, failed to complete certain required tasks, and failed to provide updates about his progress as required.  Doc. 38 ¶ 18; *see* Doc. 37-2 at 16–22. The evaluation further stated that, as a result of Krow's performance deficiencies, PineBridge had changed Krow's responsibilities from server engineer to a desktop support role in the middle of the year.  Doc. 38 ¶ 18; Doc. 37-2 at 20.  While the evaluation also included some positive comments about Krow's achievements, the evaluation concluded, "Solomon did not have a good year.  He has consistently failed to meet expectations, which has required . . . more management oversight and monitoring than an employee at his level should require."  Doc. 37-2 at 21.

In January 2018, Motz and McGuinness decided to terminate Krow's employment with PineBridge, along with the position of another IT employee, both to reduce the company's costs and because of his poor performance.[10]  Doc. 38 ¶ 19; Doc. 35 ¶ 12–14; Doc. 54 at 2, 10, 16.  PineBridge offered Krow a separation agreement, which provided that his last day of employment would be February 2, 2018.  Doc. 37-2 at 52.  The proposed separation agreement included, among other provisions, that PineBridge would pay Krow eight weeks of severance pay at his then-salary along with a 2017 discretionary

---

[10] Krow maintains that this decision was pretextual and that his termination was discriminatory.  In his response to PineBridge's 56.1 statement, he writes that his negative evaluations were of his unaccommodated performance, and therefore his termination was "an illegal termination motivated by disability discrimination."  Doc. 38 ¶ 19; Doc. 50 ¶ 19.

bonus for a total of $36,250 and one month of outplacement services with a career consulting company, in exchange for a general release of any claims against the company. Doc. 38 ¶ 20; Doc. 37-2 at 52–60; Doc. 37-1 at 53–57.  Krow did not sign the separation agreement, nor did he negotiate for higher severance pay or any other changes to the provisions included in the proposed agreement.[11]  Doc. 38 ¶ 21; Doc. 37-1 at 57.

### D.  Krow's Declaration

In connection with his opposition, Krow submits a declaration dated May 31, 2021.  *See* Doc. 51.  The declaration does not raise any concrete dispute about the facts in PineBridge's 56.1 statement or any of PineBridge's evidentiary submissions, but it does paint a different picture about when PineBridge—through Hamade—first became aware of Krow's vision disability and about the motives underlying PineBridge management's communications with NJCB and with him.  *See* Doc. 51 ¶¶ 7–11, 16–18, 22–26, 28, 30–31; Doc. 50 ¶¶ 14–17, 19, 25, 39, 82.

First, Krow claims in his complaint and in his declaration that the company was on notice of his disability shortly after his 2015 stroke.  His complaint alleges that he first made "verbal requests" for vision enhancement equipment to Hamade in approximately 2016 and that he "assumed" that Hamade discussed these requests with his own supervisors.  Doc. 2 at 10–11 ¶¶ 12–15, 19.  In his declaration, he maintains that Hamade commented on his poor eyesight as early as September 2015, when he remarked that Krow's eyes were "really bad" and that Krow needed to do something about his vision. Doc. 50 ¶¶ 7, 10.  Krow does not dispute that he did not ask PineBridge for an accommodation at his January 2017 meeting with HR, but his opposition maintains that he informed them at that time that he was working with NJCB to obtain the necessary

---

[11] In his opposition, Krow maintains that he did not sign the severance agreement because he considered it to be "an attempt [by PineBridge] to avoid the consequences of their discriminatory behavior."  Doc. 50 ¶¶ 20–21.

equipment, and that by May 2017, he "pleaded" with PineBridge to help him with the NJCB process.  Doc. 50 ¶ 25; Doc. 51 ¶ 26.

Second, Krow blames obstruction by PineBridge for the delay in his receiving the vision enhancement equipment he needed.  Krow's declaration states that PineBridge had received the list of recommended equipment by June 2, 2017; that PineBridge could have purchased the equipment at that point, but refused to; and that by not purchasing the equipment for him outright, PineBridge forced Krow to navigate the lengthy financing process through NJCB.  Doc. 51 ¶ 27–34.  Krow maintains that he only became aware that PineBridge had a duty to purchase the equipment for him in August 2017, at which time he pointed that out to the company.  *Id.* ¶ 29.  Krow's declaration further states that, after he sent his letter stating that PineBridge had an obligation to provide him with reasonable accommodations, he was asked to transfer certain duties to another employee and to train other employees on his job duties.  *Id.* ¶ 32.  Fearing he had jeopardized his job by requesting an accommodation, Krow "felt [he] had no choice but to be quiet and continue to try and procure the equipment through the slow and laborious NJCB financing process."  *Id.*  Krow's declaration further maintains that NJCB informed PineBridge that he would need about six months of training before he became proficient in using the equipment, and that NJCB scheduled in-office visits in November and December 2017 to train him.  *Id.* ¶ 36.  Krow states that, once he received the equipment, that he had to "drag" the equipment back and forth from his home to the office because PineBridge would not purchase a set of equipment for use in the office for him, and that the company did not allow him a reasonable period of time to become familiar with using the equipment before firing him.  *Id.* ¶ 35, 37.

Third, Krow's complaint alleges that he was not in fact terminated due to restructuring, because his job duties were assigned to several other employees, thus "refuting PineBridge's assertion that it had eliminated [his] position," and his termination was in fact based on PineBridge's disability discrimination and retaliation.  Doc. 2 at 16

¶¶ 68–70; *see also* Doc. 50 ¶ 19; Doc. 51 ¶ 37.  Krow's declaration and opposition to PineBridge's 56.1 statement maintain that PineBridge's documentation of the accommodation process was self-serving and that his firing was pretextual.  While he agrees that his supervisors and management held weekly meetings with him throughout 2017, Krow claims that the purpose of the meetings was for PineBridge "to document criticisms of [his] unaccommodated job performance," and to build a record protecting themselves and supporting his termination.  Doc. 50 ¶ 17, 25.  Finally, Krow's opposition maintains that although he did thank PineBridge repeatedly for its efforts to accommodate him, he was afraid of losing his job when he made those statements, and "these were not communications between parties with equal power."  Doc. 50 ¶¶ 47, 53, 56, 83.

### E.  Krow's Vision Disability

At this juncture, PineBridge does not contest that Krow is legally blind or that he has a disability as defined by the ADA, NYSHRL, and NYCHRL.  Doc. 34 at 18.  According to Krow's complaint, he is considered legally blind by the United States Social Security Administration and by NJCB.  Doc. 2 at 10 ¶ 2.  He was deemed eligible for disability benefits by the Social Security Administration in January 2018 and began receiving benefits in July 2018.  *Id.*

Krow does not proffer any evidence beyond his declaration and the January 2017 letter from Kravtsov as to the extent of his disability or his remaining vision.  In his complaint, he alleges that he proactively asked Hamade for vision enhancement equipment as early as 2016, Doc. 2 at 11 ¶ 13, and in his declaration, he states that, after his stroke, Hamade remarked on his poor vision, Doc. 51 ¶ 7.  The letter from Kravtsov states that he has significant loss of vision and is eligible for vocational rehabilitation services, but it does not provide specific information about his limitations.  Doc. 37-2 at 64.  PineBridge's submission includes the June 20, 2017 letter from Dr. Rucker, which states that she saw Krow for a single visit in November 2015, following his stroke, and that he has "loss of visual acuity for distance and near, loss of color vision, and markedly

reduced visual fields in each eye." Doc. 37-3 at 6.  Her letter specifically stated that she did not make recommendations for accommodations.  *Id.*  The excerpts of Krow's deposition testimony before the Court do not include any testimony regarding comments made before January 2017 by Hamade or anyone else about his eyesight.  Nor do they include any testimony that he told Hamade or anyone at PineBridge about his vision problems before January 2017.  *See* Doc. 37-1.

### F.  Procedural History

According to Krow's complaint, the EEOC issued him a notice of right to sue on approximately March 25, 2019.[12]  Doc. 2 at 6.  On June 18, 2019, Krow brought this action seeking compensatory damages for backpay, bonus and benefit payments, emotional distress, and any other appropriate relief.  *Id.*  On August 28, 2019, PineBridge answered.  Doc. 12.  McGuinness has not answered, as he has never been served in this action.[13]  On March 31, 2021, PineBridge moved for summary judgment.  Doc. 33.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might "affect the outcome of the litigation under the governing law."  *Id.* (quoting *Miner v. Clinton County N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[12] Krow did not include a copy of the notice with his complaint.  However, Defendants do not dispute that Krow has properly exhausted his ADA claims.

[13] On August 20, 2019, the return of service as to defendant Ronan McGuinness was returned unexecuted.  Doc. 9.  At his deposition, Krow testified that he had not served McGuinness and that he understands that McGuinness now lives in the United Kingdom.  Doc. 37-1 at 125.

323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

Courts hold submissions by *pro se* litigants to "less stringent standards than formal pleadings drafted by lawyers."  *Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir. 1993) (quoting *Hughes v. Rowe,* 449 U.S. 5, 9 (1980)).  Courts must give "special solicitude" to *pro se* litigants in connection with motions for summary judgment.  *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).  A *pro se* party's papers opposing summary judgment are to be read liberally and interpreted to "raise the strongest arguments that they suggest."  *Clinton v. Oppenheimer & Co. Inc.*, 824 F. Supp. 2d 476, 481 (S.D.N.Y. 2011) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).  Thus, the special solicitude afforded *pro se* parties is not unlimited and does not "relieve" a plaintiff of his or her "duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted).  "Nor is the 'duty to liberally construe a plaintiff's [opposition] ... the equivalent of a duty to re-write it.'" *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 65 (quoting *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009)).

## III.   DISCUSSION

### A.  Discrimination Claims Based on Failure to Accommodate

"Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Brady v. Wal-Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)).  Under the ADA, the NYSHRL, and the NYCHRL, an employer is required to afford reasonable accommodation of an employee's known disability unless the accommodation would impose an undue hardship on the employer.[14]  *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (citing 42 U.S.C. § 12112(b)(5)(A); N.Y. Exec. L. 296(3)(a)); *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 412 (S.D.N.Y. 2014) (citing N.Y.C. Admin. Code §§ 8–107(15)(a), 8–102(18)).  To maintain a *prima facie* case based on

---

[14] The NYSHRL defines "disability" more broadly than does the ADA, *Treglia v. Town of Manlius*, 313 F.3d 713, 723 (2d Cir. 2002), and the NYCHRL defines both "disability" and "reasonable accommodation" more broadly than either the ADA or the NYSHRL.  *See Nieblas-Love*, 165 F. Supp. 3d at 73–74 (citations omitted); *Vangas v. Montefiore Med. Ctr.*, 6 F. Supp. 3d 400, 416 (S.D.N.Y. 2014).  However, those broader definitions are not at issue here.

discrimination for failure to accommodate, a plaintiff employee must establish by a preponderance of the evidence that:  "(1) he is disabled within the meaning of the ADA; (2) his employer is a covered entity; (3) he could perform the essential functions of his job with an accommodat-ion; and (4) the defendants refused to provide such an accommodation despite being on notice."  *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (quoting *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96–97 (2d Cir. 2009)); *Nieblas-Love*, 165 F. Supp. 3d at 73; *see also Noll*, 787 F.3d at 94 (ADA and NYSHRL); *Snowden v. Trustees of Columbia Univ.*, 612 F. App'x. 7, 10 (2d Cir. 2015) (summary order) (NYCHRL).

For purposes of the instant motion, PineBridge does not dispute that Krow has met the first three requirements to show a *prima facie* case of discrimination for failure to accommodate.  Doc. 34 at 18.  Accordingly, the only question before the Court is whether there is a genuine dispute over whether PineBridge refused to provide Krow a reasonable accommodation.  Based on the record before the Court, no reasonable fact-finder could determine that PineBridge refused to accommodate Krow after January 10, 2017, when Krow submitted the letter from Kravtsov, his vocational rehabilitation counselor, informing the company that he was legally blind.

Once an employer has notice of an employee's disability, both parties must engage in an "an informal and flexible 'interactive process' meant to determine whether and how an employer can reasonably accommodate its employee."  *Goonan v. Fed. Rsrv. Bank of New York*, No. 12 Civ. 3859 (JPO), 2014 WL 3610990, at *5 (S.D.N.Y. July 22, 2014); *see also Brady*, 531 F.3d at 135–36 (holding that employer was obligated to engage in the interactive process where employee's disability was obvious, even in the absence of a specific request from the employee); *Noel v. BNY-Mellon Corp.*, 514 F. App'x 9, 10 (2d Cir. 2013) (summary order) (NYSHRL and NYCHRL also require participation in an interactive process).  "This process should identify the precise

limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  29 C.F.R. § 1630.2(o)(3).

Under the ADA, failure to engage in the interactive process does not form the basis of a disability discrimination claim in the absence of evidence that a reasonable accommodation was possible.  *McBride*, 583 F.3d at 100–01.  However, under the NYSHRL and NYCHRL, failure to engage in the interactive process itself violates the law.  *Vangas*, 6 F. Supp. 3d at 420 (citing *Phillips v. City of New York*, 66 A.D.3d 170, 176 (1st Dep't 2009)); *see also Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 837, 11 N.E.3d 159, 169 (N.Y. 2014) (holding that both the NYSHRL and NYCHRL require employers to engage in a good faith interactive process to assess "the needs of the disabled individual and the reasonableness of the accommodation requested[.]").  A good-faith interactive process may involve an employer meeting with the employee, requesting information about the employee's condition, asking what the employee wants, considering the request, and offering and discussing alternatives.  *Goonan*, 2014 WL 3610990, at *5 (citing *Taylor v. Phoenixville Sch. Dist.,* 174 F.3d 142, 162 *on reh'g,* 184 F.3d 296 (3d Cir. 1999)).  "When this interactive process fails, liability attaches to the party who caused the breakdown.  In determining responsibility for the failure of an interactive process, courts look to *good faith* and *reasonable efforts* in light of the complete set of circumstances to isolate the cause of a breakdown and assign liability."  *Id.* (citing *Beck v. Univ. of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1135–36 (7th Cir. 1996)).  A party that obstructs or delays the interactive process, or that fails to communicate, is not acting in good faith.  *Id.* at *7.

Despite Krow's declaration to the contrary, no reasonable trier of fact could find on this record that, after January 2017, PineBridge failed to engage in good faith in an interactive process with the goal of providing Krow a reasonable accommodation.  *See, e.g.*, *Noel v. BNY-Mellon Corp.*, No. 10 Civ. 9143 (JSR), 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011), *aff'd,* 514 F. App'x 9 (2d Cir. 2013) (granting summary judgment

for employer where the court found that employee had withdrawn from the interactive process); *Stuart v. T-Mobile USA, Inc.*, No. 14 Civ. 4252 (JMF), 2015 WL 4760184, at *10 (S.D.N.Y. Aug. 12, 2015) (granting summary judgment for defendants based on a record "replete with evidence that [d]efendants *did* in fact engage in an interactive process.").   From January 11, 2017, the day after Krow first provided PineBridge with the letter from Kravtsov stating that he had significant loss of vision, PineBridge did try to help him obtain a reasonable accommodation.   On January 12, two HR employees met with Krow.   After Krow asked PineBridge in May to liaise with NJCB to obtain equipment for him, Buxton and Motz—the Global Head of HR—spent months following up with Krow and Kravtsov, trying to ensure that Krow had the equipment he needed. Furthermore, the record shows that PineBridge communicated with Kravtsov and NJCB at Krow's request, because Krow did not know what equipment he needed and was waiting for Kravtsov to provide recommendations.   Doc. 38 ¶¶ 23–24; Doc. 50 ¶¶ 23–24; Doc. 37-1 at 69–73.   Buxton's and Motz's many emails from May 2017 and later indicate that PineBridge was eager to set up accommodations for Krow as soon as possible, and that the company offered to pay for his equipment.   During the five-month period between the time Kravtsov first sent the list of recommended equipment and the time Krow obtained it, Defendants repeatedly contacted Krow and Kravtsov about the status of Krow's application for financial assistance from NJCB and the purchase of the required equipment, which PineBridge offered at least twice to pay for, if necessary.

The only evidence in the record to the contrary is Krow's May 31, 2021 declaration—written approximately three and a half years after the end of his employment at PineBridge and submitted in support of his opposition—in which he maintains that PineBridge created obstacles to his obtaining the equipment and refused to

purchase the equipment for him.[15]  *See* Doc. 51.  The Second Circuit instructs that

"factual issues created solely by an affidavit crafted to oppose a summary judgment

motion are not 'genuine' issues for trial."  *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No.

05 Civ. 5109 (JCF), 2007 WL 1149979, at *20 (S.D.N.Y. Apr. 18, 2007), *aff'd sub*

*nom. Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008) (quoting

*Hayes v. New York City Department of Corrections,* 84 F.3d 614, 619 (2d Cir. 1996)).  On

this record, a fact-finder could reasonably find that Krow was at times confused about his

legal rights and unsure of how to proceed, or waiting for Kravtsov and NJCB, or

subjectively afraid, given his poor 2016 performance reviews, that pushing too hard could

antagonize his supervisors.  However, Krow's declaration is insufficient to create any

genuine issue of material fact that PineBridge refused him an accommodation after

January 2017.  While *pro se* litigants are awarded special solicitude when defending

---

[15] Krow's deposition testimony accords with PineBridge's 56.1 statement regarding PineBridge's efforts after January 2017 to implement a reasonable accommodation for him.  At his deposition, he testified that as of May 2017, he was waiting for Kravtsov to provide recommendations, because he did not know what equipment he would need.  *See* Doc. 37-1 at 71–73.  The only statements in the record contrary to PineBridge's submission are in Krow's complaint and in his May 2021 declaration.  Krow's declaration, which departs from his deposition testimony as to (1) when PineBridge had notice of his vision problems (not included in his deposition testimony) and (2) whether PineBridge stalled or refused in purchasing vision enhancement equipment for him, is on the whole consistent with the allegations in his complaint.  His complaint, however, is not verified, *see Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *Lievre v. JRM Constr. Mgmt., LLC*, No. 17 Civ. 4439 (BCM), 2019 WL 4572777, at *2 n.3 (S.D.N.Y. Sept. 20, 2019), and may not function as an affidavit at summary judgment; accordingly, it has no evidentiary value, and the Court considers only the declaration.  Krow's declaration is defective—it is signed only with the character /s rather than with a complete, ink signature, and accordingly does not comport with 28 U.S.C. § 1746, which requires an actual signature from the declarant.  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65 (2d Cir. 1999) (setting forth requirements of § 1746); *Dilworth v. Goldberg*, No. 10 Civ. 2224 (JMF), 2014 WL 3798631, at *1 (S.D.N.Y. Aug. 1, 2014) (requiring a signature on a verified statement to satisfy § 1746, and explaining that the "/s" character may substitute as a signature only for an attorney filing documents through the Electronic Case Filing System); *Batista v. United States*, No. 14 Civ. 895 (DLI)(LB), 2017 WL 3700889, at *2 (E.D.N.Y. Aug. 25, 2017).  Nevertheless, considering Krow's *pro se* status and mindful of his vision problems, the Court will consider the declaration rather than requiring him to resubmit it.  *See Hannah v. Wal-Mart Stores, Inc.*, No. 12 Civ. 01361 (VAB), 2016 WL 554771, at *1 (D. Conn. Feb. 11, 2016), *on reconsideration in part,* No. 12 Civ. 01361 (VAB), 2016 WL 3101997 (D. Conn. June 2, 2016), *aff'd sub nom. Hannah v. Walmart Stores, Inc.,* 803 F. App'x 417 (2d Cir. 2020), and *aff'd sub nom. Hannah v. Walmart Stores, Inc.*, 803 F. App'x 417 (2d Cir. 2020) ("To avoid the exercise of requiring Plaintiffs to resubmit this document with a signature, further delaying this matter, the Court considered it, to the extent competent.")

against summary judgment motions, "a *pro se* plaintiff, like any other party, must come forward with evidence in admissible form that is capable of refuting those facts." *Jermosen v. Coughlin*, 877 F. Supp. 864, 867 (S.D.N.Y. 1999). The Court need not credit Krow's declaration insofar as it contradicts his deposition testimony and contemporaneous emails by stating that he informed PineBridge of his legal blindness in his August 15, 2016, letter—a review of the letter itself shows that he did not—or that PineBridge refused to purchase vision enhancement equipment for him. "[A]s a matter of summary judgment law, such after-the-fact conclusory assertions are not sufficient to raise a genuine issue of fact particularly when they are contradicted by the record and the contemporaneous evidence." *EVIP Canada, Inc. v. Schnader Harrison Segal & Lewis LLP*, No. 18 Civ. 11456 (LJL), 2021 WL 964943, at *26 (S.D.N.Y. Mar. 15, 2021) (collecting cases).

The parties do dispute when PineBridge first had either actual or constructive notice of Krow's disability, and therefore when it had an obligation to provide him with a reasonable accommodation. PineBridge claims that it first became aware of Krow's disability in January 2017, when he submitted the letter from NJCB. Krow, on the other hand, claims in his complaint that he first made "verbal requests" for vision enhancement equipment to Hamade in approximately 2016 that he "assume[d]" were passed on to Hamade's own supervisors, and claims in his declaration that the company was on notice shortly after his 2015 stroke, when Hamade commented on his "really bad" eyesight. Doc. 2 at 10–11 ¶¶ 12–15, 19; Doc. 51 ¶ 7. Krow puts forth no evidence in support beyond his own belated declaration, and as noted above, the excerpts of his deposition before the Court do not include testimony that he informed the company of his disability before January 2017.

Nevertheless, if Krow's disability was obvious, that triggered a duty by PineBridge to engage in the interactive process of seeking an accommodation. "[G]enerally, it is the responsibility of the individual with a disability to inform the

employer that an accommodation is needed." *Graves v. Finch Pruyn & Co.,* 457 F.3d 181, 184 (2d Cir. 2006); *see also Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 18–19 (2d Cir. 2015) ("[A]n employer cannot 'refuse [ ] to make [an] accommodation' . . . that it was never asked to make") (quoting *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013)) (summary order).  However, "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Brady*, 531 F.3d at 135; *see also Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2021).  The NYSHRL has been interpreted to impose the same requirement on an employer.  *Glaser v. Gap Inc.*, 994 F. Supp. 2d 569, 580 (S.D.N.Y. 2014) ("An employer has an independent duty to reasonably accommodate an employee's disability if the employer knew or reasonably should have known that the employee was disabled, whether or not a specific request has been made.") (quoting *Miloscia v. B.R. Guest Holdings LLC*, 928 N.Y.S.2d 905, 915 (N.Y. Sup. Ct. 2011)).

The question, therefore, is whether Krow's disability was sufficiently obvious such that PineBridge should have been on notice before January 2017.  "To satisfy the notice requirement, a plaintiff must demonstrate that the defendant was aware that the plaintiff 'was "disabled" within the meaning of the ADA.'"  *Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289, 305–06 (S.D.N.Y. 2014) (quoting *Young v. Ltd. Brands,* No. 11 Civ. 2927 (KBF), 2013 WL 5434149, at *8 (S.D.N.Y. Sept. 25, 2013) and collecting cases).  In general, courts have found that an employer should have known of an employee's disability where there is some indication that the disability affected the way the employee outwardly presented or behaved.[16]  Another line of cases holds that,

---

[16] *See Brady*, 531 F.3d at 130, 135 (plaintiff's cerebral palsy was obvious disability where it "manifested itself in noticeably slower walking, walking with a shuffle and limp, recognizably slower and quieter speech, not looking directly at people when talking to them, weaker vision, and a poor sense of direction"); *Glaser*, 994 F. Supp at 575–76, 80 (genuine issue of material fact whether employer knew or should have known that plaintiff with autism spectrum disorder had a disability, based on its knowledge of his

even where an employee has not requested a reasonable accommodation, the employer should have known about the employee's disability where it has received some other kind of concrete notice, as when the employee has required hospitalization or extended leave, or the employee has otherwise provided notice to the employer about a specific disability or health condition, beyond general health problems.[17]

interactions with coworkers); *Moloney v. Home Depot U.S.A., Inc.*, No. 11-10924, 2012 WL 1957627, at *15 (E.D. Mich. May 31, 2012) (adopting *Brady* and concluding that triable issue of fact existed as to whether intellectually disabled plaintiff had an obvious disability, where thirty-four-year-old plaintiff had been accompanied at the job interview by his father, and plaintiff's supervisors had testified that they knew he lived in a group home and were aware that his verbal processing was slower than other employees'); *but see Fox*, 918 F.3d at 73 (affirming grant of summary judgment to employer on plaintiff's ADA claim, where plaintiff had not introduced evidence that employer should have known that his Tourette's Syndrome and Obsessive Compulsive Disorder would be affected by a change in work assignment); *Harris v. NYC Hum. Res. Admin.*, No. 20 Civ. 2011 (JPC), 2021 WL 3855239, at *11 (S.D.N.Y. Aug. 27, 2021) (granting employer's motion to dismiss because, even assuming plaintiff's arthritis to be a disability under the ADA, plaintiff who "walk[ed] with a cane" and informed management multiple times that she was experiencing physical pain, had not alleged that defendant employer was on notice that she had a disability); *Stefanidis v. Jos. A. Bank Clothiers, Inc.*, No. 14 Civ. 971 (VAB), 2016 WL 845297, at *11 (D. Conn. Mar. 2, 2016) (nothing inherently obvious about plaintiff's chronic tonsillitis or the fact that he had taken leave for a tonsillectomy to indicate that he was disabled); *Miceli v. Mehr*, No. 17 Civ. 00029 (VAB), 2019 WL 5727387, at *11 (D. Conn. Nov. 5, 2019), *aff'd*, 830 F. App'x 63 (2d Cir. 2020) (granting summary judgment where plaintiff had not introduced admissible evidence that defendants perceived him as having PTSD); *Wega v. Ctr. for Disability Rts.,* No. 06 Civ. 375, 2009 WL 3199684, at *10 (W.D.N.Y. Sept. 30, 2009), *aff'd sub nom. Wega v. Ctr. for Disability Rts. Inc.*, 395 F. App'x 782 (2d Cir. 2010) (granting summary judgment for employer where plaintiff had not requested a reasonable accommodation for his walking, shoulder problems, effects of his stroke, or verbal communication and cognitive limitations, and did not allege that they were obvious); *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 811–12 (10th Cir. 2016) (plaintiff with unspecified "mental disability," who did not exhibit any outward physical manifestations of her disability, had not established that employer should have known she had a disability).

[17] *Piligian v. Ichan Sch. of Med. at Mount Sinai*, No. 17 Civ. 01975 (ALC) (SDA), 2020 WL 6561663, at *2, 10 (S.D.N.Y. Apr. 7, 2020), *report and recommendation adopted sub nom. Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707 (S.D.N.Y. 2020) (denying employer's motion for summary judgment where plaintiff had adduced evidence that employer was on notice of his Convergence Insufficiency, an eye disorder that interferes with ability to maintain binocular function and manifested in vertigo, nausea, and vomiting after focusing for long periods of time on a computer screen, and employer had failed to at least assess the possibility of additional accommodations before declining to reappoint plaintiff); *Tse v. New York Univ.*, No. 10 Civ. 7207 (DAB), 2016 WL 10907062, at *8–9, 23 (S.D.N.Y. Aug. 29, 2016) (although plaintiff did not ask employer university for a reasonable accommodation, she had established that employer was aware of her disability—severe arthritis and lupus—and that it was "obvious" under *Brady*, where employer had been aware of plaintiff's disability at least five years before declining to reinstate her to non-tenured position and where plaintiff had previously had a laboratory assistant as an accommodation through separate grant funding); *Petrone v. Hampton Bays Union Free Sch. Dist.*, No. 03 Civ. 4359 (SLT) (ARL), 2013 WL 3491057, at *29 (E.D.N.Y. July 10, 2013), *aff'd*, 568 F. App'x 5 (2d Cir. 2014) (plaintiff teacher's failure to request an accommodation was not dispositive of the issue of whether employer had an obligation to engage in the interactive process, where teacher had been diagnosed with Generalized Anxiety Disorder and Panic Disorder and had provided a note from his psychiatrist to the school district); *Robles v.*

An argument could be made that Krow's disability was sufficiently obvious to trigger an obligation by PineBridge to engage in the interactive process.  Drawing all inferences in favor of Krow, mindful of the Second Circuit's charge to consider papers by *pro se* litigants to raise the strongest arguments that they suggest, and considering the lack of evidence before it about the manifestation of Krow's legal blindness, the Court finds that PineBridge has not established that it lacked knowledge of Krow's disability before January 2017.  Krow's declining performance reviews, which indicate that his ability to do his job deteriorated markedly after his stroke, of which PineBridge had knowledge, arguably support a reading that the company should have known that something was wrong.  There thus remains a genuine dispute whether PineBridge had at least constructive notice of his disability, and therefore an obligation to engage in good faith in an interactive process, *before* Krow provided the January 2017 letter from NJCB.

That dispute is not enough to save Krow's pre-January 2017 failure to accommodate claim under the ADA, which is time-barred.  A plaintiff raising a failure to accommodate claim must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred."  *Gomez v. New York City Police Dep't*, 191 F.

---

*Medisys Health Network, Inc.*, No. 19 Civ. 6651 (ARR) (RML), 2020 WL 3403191, at *11 (E.D.N.Y. June 19, 2020) (employer hospital knew or should have known that plaintiff suffered from a disability after plaintiff, who suffered from depression and bipolar disorder and whose girlfriend's adult daughter died suddenly and under traumatic circumstances, "suffered a mental breakdown and was found lying in the street," and was taken by ambulance to the very hospital where he worked); *St. Amour v. Lawrence & Mem'l Corp.*, No. 09 Civ. 01055 (JAM), 2016 WL 4744120, at *5–6 (D. Conn. Sept. 12, 2016) (genuine issue of material fact existed as to whether plaintiff, who had hypertension and high blood pressure requiring hospitalization and multiple hospital visits, along with other ailments, was disabled and whether employer hospital knew or should have known that she was disabled); *Lareau v. Nw. Med. Ctr.*, No. 17 Civ. 81, 2019 WL 2929793, at *7–8 (D. Vt. July 8, 2019) (medical center on notice that stress and tight deadlines were problematic for plaintiff, despite accommodations, should have assessed possibility of additional accommodations before terminating her employment); *but see Scorsonelli v. Madison Dentistry, P.C.*, No. 18 Civ. 4269 (JMF), 2019 WL 6032787, at *1 (S.D.N.Y. Nov. 14, 2019) ("The law requires employers to engage employees they know or should know suffer from a disability in an interactive process to identify a reasonable accommodation."); *Lievre*, 2019 WL 4572777, at *21 ("mere awareness of an employee's health issues does not translate into an awareness of that employee's need for additional accommodations under the ADA"); *Rosario v. City of New York*, No. 11 Civ. 9008 (PAC) (SN), 2013 WL 782408, at *10 (S.D.N.Y. Jan. 9, 2013), *report and recommendation adopted*, No. 11 Civ. 9008 (PAC) (SN), 2013 WL 782581 (S.D.N.Y. Mar. 1, 2013) (dismissing plaintiff's failure to accommodate claim where he had not alleged that defendants were aware of the need for reasonable accommodation before he made his request).

Supp. 3d 293, 301 (S.D.N.Y. 2016) (quoting 42 U.S.C. § 2000e–5(e)(1) and 42 U.S.C.

§ 12117(a)); *see also Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999).

Even assuming that a violation occurred as late as January 10, 2017, Krow's deadline to

file a charge with the EEOC would have been November 6, 2017.  The EEOC did not

issue Krow's right to sue notice until late March 2019; accordingly, there is no indication

that he filed any charge based on failure to accommodate within the 300-day window.

The NYSHRL and NYCHRL provide a three-year statute of limitations.  *Kassner v. 2nd*

*Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (NYSHRL); *Hongyan Lu v.*

*Chase Inv. Servs. Corp.*, 412 F. App'x 413, 418 (2d Cir. 2011) (summary order)

(NYSHRL and NYCHRL have three-year statutes of limitations).  PineBridge therefore

argues that any claims relating to matters before June 18, 2016 are time-barred.  Doc. 54

at 6 n.4.

However, courts in this Circuit have held that the statute of limitations is tolled

during the pendency of a complaint before an administrative body—that is, during the

time period between the filing of an EEOC charge and the issuance by the EEOC of a

right-to-sue letter.  *Shojae v. Harlem Hosp. Ctr.*, 764 F. App'x 113, 114 n.2 (2d Cir.

2019) (summary order) (noting that while the Second Circuit has not addressed whether

the statute of limitations is tolled on claims under the NYSHRL and the NYCHRL while

an EEOC complaint pends, that it is the "clear trend" among the District Courts); *see also*

*Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016).  Therefore,

Krow's NYSHRL and NYCHRL claims based on failure to accommodate were tolled for

at least some part of 2019, before he received the right-to-sue notice, and those claims

dating back to some time in the spring or summer of 2016—before PineBridge began to

engage in the interactive process with him—are not time-barred.

Accordingly, PineBridge's motion for summary judgment is granted with respect

to Krow's failure to accommodate claims under the ADA, but denied for his failure to

accommodate claims under the NYSHRL and NYCHRL, as the record before the Court

does not indicate that no reasonable fact-finder could conclude that Krow's legal blindness was not an obvious disability of which PineBridge should have been aware before January 2017.

### B. Discrimination and Retaliation Claims Based on Termination

Krow alleges that his January 2018 termination was motivated by discrimination and was retaliation by PineBridge for his having sought a reasonable accommodation. Doc. 2 at 16 ¶¶ 70–71.  For the reasons set forth below, both claims fail as a matter of law.

#### 1. Discrimination

Disability discrimination claims under the ADA, NYSHRL, and NYCHRL are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Nieblas-Love*, 165 F. Supp. 3d at 72–73; *see also Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).  Under that framework, a plaintiff must first establish a *prima facie* case of discrimination.[18]  If they do, a presumption of discrimination arises, and the burden shifts to the defendant to proffer some legitimate nondiscriminatory reason for the adverse action.  *Spiegel*, 604 F.3d at 80 (citing *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005)).  "If the defendant proffers such a reason, the presumption of discrimination . . . drops out of the analysis, and the defendant will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  *Dawson*, 398 F.3d at 216

---

[18] "In order to establish a prima facie case of discrimination under the ADA, the plaintiff must demonstrate that:  (1) his employer is subject to the ADA; (2) he is disabled within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability."  *Beaton v. Metro. Transportation Auth. New York City Transit*, No. 15 Civ. 8056 (ER), 2018 WL 1276863, at *4 (S.D.N.Y. Mar. 2, 2018) (citing *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2015)).  Plaintiffs have a lower burden to establish discrimination under the NYCHRL, which requires only a demonstration "by a preponderance of the evidence that [he] has been treated less well than other employees because of" his protected characteristic.  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (internal quotation marks and citations omitted).  Whether Krow has established a *prima facie* case of discrimination is not at issue before the Court and is not dispositive, as Krow's discrimination claim necessarily fails at the third stage of the burden-shifting analysis.

(internal quotation marks and citations omitted).  The plaintiff must establish by a preponderance of the evidence that the proffered nondiscriminatory reason is pretextual.  *Spiegel,* 604 F.3d at 80.

PineBridge argues that, even assuming that Krow could demonstrate a *prima facie* case of discrimination, his discrimination claim fails because there is no evidence that Motz and McGuinness had a discriminatory motive in terminating him.  Doc. 34 at 21.  In opposition, Krow argues—relying on his declaration—that any performance issues were due to his disability, for which he lacked accommodation, and that his termination due to poor performance caused by his disability was therefore disability discrimination.  Doc. 49 at 18–20.

PineBridge is entitled to summary judgment because it has established a nondiscriminatory reason for his termination, and because Krow has not pointed to *any* evidence that his termination was pretextual and in fact based on animus.  PineBridge maintains that it eliminated Krow's position both to reduce costs and because of his poor performance.  Krow's 2016 mid-year and annual performance review and his 2017 performance review indicate that he consistently failed to meet deadlines and other expectations of his employment as a senior systems engineer, and his supervisor issued him two written warnings that he would be terminated if his performance did not improve.  Doc. 38 ¶¶ 7–12, 18; Doc. 37-2 at 16–43.  PineBridge has also put forth evidence that Motz and McGuinness eliminated another employee's position in addition to Krow's to reduce the company's costs.  Doc. 38 ¶ 19; Doc. 35 ¶ 14.  Either reason—or a combination of the two—is a legitimate nondiscriminatory reason for PineBridge's adverse action in terminating Krow.

Krow cannot meet his burden at the third step, because he has not proffered any evidence that Hamade's, McGuinness', Motz's, Buxton's, or anyone else's actions were motivated by animus against people who are blind or visually impaired, or by any other

wrongful animus against him.[19]  *See, e.g.*, *Wesley-Dickson v. Warwick Valley Cent Sch. Dist.*, 586 F. App'x 739, 744 (2d Cir. 2014) (summary order) (affirming grant of summary judgment where defendant school district had terminated Black employee with cancer based on her poor performance, and finding that employee had not established that the reason for termination was a pretext for racial or disability discrimination); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) (granting summary judgment for employer on disability discrimination and retaliation claims and stating that "this Court's role is not to second-guess business decisions or to question a corporation's means to achieve a legitimate goal[.]" (internal quotation marks and citation omitted)), *aff'd,* 205 F.3d 1327 (2d Cir. 2000).  Krow relies on *Parker v. Columbia Pictures Indus.*, 204 F.3d 326 (2d Cir. 2000) and *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131 (2d Cir. 1995) to argue that his termination for poor performance due to his blindness was disability discrimination.  However, that argument fails because both cases involved disabled employees who had been denied reasonable accommodations and then terminated for poor performance due to their non-accommodated disabilities.  *See Parker*, 204 F.3d at 338; *Borkowski*, 63 F.3d at 143.  As set forth above, here there is no indication that PineBridge denied Krow a reasonable accommodation after January 2017.

  *2.  Retaliation*

  Retaliation claims under the ADA and NYSHRL are also evaluated under the *McDonnell Douglas* burden-shifting scheme.  *See Nieblas-Love*, 165 F. Supp. at 74–75 (ADA); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (NYSHRL). "To establish a *prima facie* case of retaliation under the ADA, a plaintiff must allege that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4)

---

[19] Krow's complaint indicates that he is Black and was born in 1969, but both of these statements are crossed out, and he does not bring claims for employment discrimination on the basis of race or age.  Doc. 2 at 4.

there existed a causal connection between the protected activity and the adverse employment action." *Nieblas-Love*, 165 F. Supp. 3d at 74–75 (internal quotation marks and citations omitted); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (NYSHRL retaliation claims are governed by the same standards as the ADA and subject to the burden-shifting framework).

While the NYCHRL inquiry is "broader than its federal counterpart," *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010), a plaintiff must still "show that [he] took an action opposing [his] employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am. Inc.*, 715 F.3d 102, 112 (2d Cir. 2013). However, the NYCHRL "is not a general civility code": defendants are not liable where the plaintiff fails to prove that the conduct was caused at least in part by discriminatory or retaliatory motives, and summary judgment is appropriate where the record establishes as a matter of law that no reasonable fact-finder could find the employer liable. *Id.* at 113 (citations omitted). "In other words, summary judgment [on NYCHRL retaliation claims] is appropriate if the record establishes as a matter of law that discrimination *or* retaliation played no role in the defendant's actions." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 76 (2d Cir. 2015) (internal quotation marks and citations omitted).

Regardless of the different parameters to establish a claim for retaliation, under all three statutes, a plaintiff "must show a causal connection between the alleged adverse action and the protected activity[.]" *Holcombe v. U.S. Airways Grp., Inc.*, 976 F. Supp. 2d 326, 348 (E.D.N.Y. 2013) (citations omitted). Krow has not shown any such causal connection here. The parties do not dispute that requesting an accommodation is protected activity under the ADA, NYSHRL, and NYCHRL. *See Graham v. Women in Need, Inc.*, 13 Civ. 7063 (LGS), 2014 WL 2440849, at *4–5 (S.D.N.Y. May 30, 2014); *see also Weixel v. Bd. of Educ. of N.Y.C.*, 287 F.3d 138, 149 (2d Cir. 2002). Setting aside

whether Krow has made a *prima facie* claim of retaliation, his retaliation claim fails and summary judgment is appropriate because PineBridge has established, and evidence in the record supports, that PineBridge had a legitimate, non-retaliatory reason to terminate him.  Thus, it has met its burden "to articulate a legitimate, non-retaliatory reason for the challenged employment decision."  *Treglia*, 313 F.3d at 721.  Moreover, Krow has set forth no evidence that PineBridge's reasons for dismissing him—whether due to a reorganization of the company, his poor performance, or a combination thereof—were pretextual or in retaliation for his request for an accommodation.  Approximately a year passed between the time Krow actually informed PineBridge that he was legally blind and his termination, and during that time PineBridge was indisputably trying to obtain vision-enhancing equipment for him.  His argument that PineBridge's stated reasons for his termination are pretextual is mere *ipse dixit*.  Doc. 49 at 22.  Summary judgment is also appropriate even under the broader standard of the NYCHRL, because there is no evidence that discrimination or relation played any role in his termination.  *See Beaton*, 2018 WL 1276863 at *9 n.6 (collecting cases finding that summary judgment is appropriate under the NYSHRL and NYCHRL for the same reasons summary judgment is appropriate under the ADA).

### C.  Claims against Ronan McGuinness

Krow never served McGuinness, and accordingly his claims against McGuinness are subject to dismissal under Fed. R. Civ. P. 4(m).  Regardless, all of Krow's ADA claims against McGuinness fail for the independent reason that there is no individual liability under the ADA.  *Gomez*, 191 F. Supp. 3d 293, 302–03 (S.D.N.Y. 2016); *Darcy v. Lippman*, 356 F. App'x 434, 437 (2d Cir. 2009) (summary order).  However, under the NYSHRL and NYCHRL, an individual "who actually participates in the conduct giving rise to the discrimination claim may be held personally liable."  *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995); *Feingold v. New York*, 366 F.3d 138, 158 n.19 (2d Cir. 2004); *see also Glaser*, 994 F. Supp. 2d at 580–81.  Krow testified that he reported to

Hamade until Hamade's departure in approximately July 2017, when McGuinness became his direct supervisor. Doc. 37-1 at 15. Krow's allegations in his complaint, and his statements in his declaration, insist only that it was his direct supervisor Hamade who was or should have been aware of his disability before January 2017, and that he "assumed" that Hamade would have communicated his needs to higher-ups. By the time McGuinness became Krow's direct supervisor in July 2017, there can be no dispute that PineBridge—including McGuinness and senior HR staff—were actively engaged in trying to put in place reasonable accommodations as required by the ADA, NYSHRL, and NYCHRL. Accordingly, no individual liability attaches to McGuinness.

Krow's discrimination and retaliation claims under the NYSHRL and NYCHRL against McGuinness fail for the same reasons as his claims against PineBridge.

## IV.   SURVIVING NYSHRL AND NYCHRL CLAIMS

Having granted summary judgment for PineBridge on all of Krow's federal claims, the Court declines to exercise supplemental jurisdiction over his surviving state and city law claims for failure to accommodate brought under the NYSHRL and NYCHRL. *See Maysonet v. Valley Nat'l Bank*, No. 17 Civ. 3939 (RJS), 2019 WL 1368327, at *5 (S.D.N.Y. Mar. 25, 2019); *Lievre*, 2019 WL 4572777, at *22 (S.D.N.Y. Sept. 20, 2019) (collecting cases of courts in this District declining to exercise supplemental jurisdiction over state claims after summary judgment on federal claims). "A district court 'may decline to exercise supplemental jurisdiction over a claim . . . [when it] has dismissed all claims over which it has original jurisdiction.'" *Id.* (quoting 28 U.S.C. § 1367(c)(3)). In the "usual case" in which "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *see also O'Reilly v. Consol. Edison Co. of New*

*York*, 173 F. App'x 20, 23–24 (2d Cir. 2006) (finding no abuse of discretion where the district court declined to exercise supplemental jurisdiction over a plaintiff's NYCHRL and NYSHRL claims after granting summary judgment on her ADA and FMLA claims).

Dismissal of Krow's NYSHRL and NYCHRL failure to accommodate claims is without prejudice, and his federal action tolls the relevant state and city statutes of limitations. *Lievre*, 2019 WL 4572777, at *22 n.16 (discussing 28 U.S.C. § 1367(d) and N.Y. C.P.L.R. § 205(a)).

## V.   CONCLUSION

For the reasons set forth above, PineBridge's motion for summary judgment is GRANTED as to Krow's failure to accommodate claims under the ADA and his claims for discrimination and retaliation based on his termination.  His remaining state and city claims are DISMISSED without prejudice.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 33, and to close the case.


It is SO ORDERED.

Date:   March 21, 2022
        New York, New York                    _____
                                                  Edgardo Ramos, U.S.D.J.

32